1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                    EASTERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11 CURTIS LEE WASHINGTON, | ) Case No.: 1:13-cv-00175-LJO-JLT |
| | ) |
| 12        Petitioner, | ) FINDINGS AND RECOMMENDATIONS TO |
| | ) DENY PETITION FOR WRIT OF HABEAS |
| 13    v. | ) CORPUS (Doc. 1) |
| | ) |
| 14 TIM VIRGA, Warden, | ) ORDER DIRECTING THAT OBJECTIONS BE |
| | ) FILED WITHIN 21 DAYS |
| 15        Respondent. | ) |
| 16 _____ | ) |

17        In 2011, a jury convicted Petitioner of murder and found that Petitioner personally and

18  intentionally discharged a firearm proximately causing death.  (Lodged Document ("LD") 4, p. 2)The

19  Fresno County Superior Court sentenced him to an indeterminate term of 50 years-to-life.  Id. In this

20  action, Petitioner lodges various attacks on the conviction including, prosecutorial misconduct, errors in

21  admitting certain evidence related to a gun and a witness's involuntary pretrial statement, ineffective

22  assistance of counsel and cumulative error.  Because the Court finds no error, it recommends the

23  petition be **DENIED**.

24  I.      **PROCEDURAL HISTORY**

25        After his conviction, Petitioner appealed to the California Court of Appeals, Fifth Appellate

26  District (the "5th DCA"), which affirmed the conviction.  (LD 4).   He then filed a petition for review in

27  the California Supreme Court that was also denied.  (LD 5; 6).

28        Petitioner filed a state habeas petition in the state supreme court, which denied the petition on

with citations to <u>People v. Duvall</u>, 9 Cal.4th 464, 474 (1995),  and <u>In re Swain</u>, 34 Cal.2d. 300, 304 (1949).  (LD 9).  Petitioner then filed a habeas petition in the 5th DCA, which rejected the appeal, noting the issues Petitioner raised were previously raised in his direct appeal.  (LD 8).  Petitioner then filed a habeas petition in the California Supreme Court, which was denied with citations to <u>In re Clark</u>, 5 Cal.4th 750, 767-769 (1993), and <u>In re Waltreus</u>, 62 Cal.2d 218, 225 (1965).  (LD 10).

On January 30, 2013, Petitioner filed the original petition.  (Doc. 1).  Respondent's answer was filed on April 5, 2013.  (Doc. 13).  On June 14, 2013, Petitioner requested a stay of proceedings to exhaust additional claims.  (Doc. 21).  On September 20, 2013, the Court granted the stay.  (Doc. 22).  On October 11, 2013, the Court lifted the stay of proceedings and directed the Clerk of the Court to file Petitioner's lodged first amended petition.  (Docs. 26; 27).  Respondent filed the answer to the amended petition on January 8, 2014.  (Doc. 30).  Petitioner filed his Traverse on April 7, 2014.  (Doc. 36).

Respondent does not contend that any of the grounds for relief in the petition have [not] been fully exhausted.  (Doc. 30, p. 9).

## I.     FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

In the early morning of April 24, 2010, defendant shot and killed Mario Mitchell over a $40 crack cocaine debt.

Sometime in March, about four weeks before Mario was killed, he was at the apartment of his friend, Nina. Defendant, who was Nina's nephew, was also there.  Defendant and Mario made a drug deal in which Mario got a $20 piece of crack cocaine from defendant and promised to pay him $40 when he got his unemployment check.  Defendant took Mario's identification card as collateral, and Mario was supposed to call defendant the next day when he got his check.

About two weeks later, defendant returned to Nina's house and asked her if she had seen Mario because he wanted his money.  Nina told him she had not seen Mario and she was not going to hunt for him to get defendant his money; that was between him and Mario.  She told defendant it was his business and she had nothing to do with it.  At that point, defendant raised his shirt, showed Nina a small gold gun, and told her, "I want my money."  He said, "This is on you."  She took this statement to mean that if she did not find Mario and make him pay defendant, she would "feel the consequence."  She got upset and told defendant to get out and never come back. She did not see him after that.

A couple of days before the shooting, defendant went to Liz's apartment looking for Mario.  Liz and Mario were good friends.  Defendant told Liz that Nina told him to go to her apartment.  Liz did not know who defendant was, although she had seen him at Nina's.  While defendant was at Liz's apartment, Nina called Liz and was upset that defendant was there. Defendant sat at

---

[1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).  Thus, the Court adopts the factual recitations set forth by the 5th DCA.

Liz's table, pulled out a shiny silver gun, and set it on the table while he ate some food. Liz was upset. She asked him if the gun was real and he told her it was. When she asked him why he needed a gun, he said he "carried it with him." Defendant did not explain why he was looking for Mario, but Nina told Liz Mario had bought crack cocaine from defendant.

Gaylan was Mario's close friend and Liz's boyfriend. Gaylan was living with Mario. On April 23, at about 11:00 p.m., Gaylan and Mario went to Liz's apartment. Their friend, Marvin, was already there. Mario and Marvin left to buy cigarettes and beer, but they did not return as expected. Instead, they went to Nina's apartment to get some crack cocaine. When Mario was ready to leave Nina's apartment, Marvin was still flirting with a girl.

Meanwhile, around midnight, defendant came by the home of 15–year–old Deidra, and they went out walking in the neighborhood.

At Liz's apartment, Gaylan was still waiting for Mario and Marvin, so he asked Liz to call Mario. She tried more than once and finally reached Mario around 2:00 a.m. Mario asked Liz to tell Gaylan to come to Nina's apartment and they would walk home together. When Gaylan arrived at Nina's apartment, Mario let him in, took a quick smoke of crack, and left down the stairs. Gaylan caught up with Mario as he encountered defendant and Deidra on the sidewalk. Defendant talked to the two men for 10 or 15 minutes while Deidra stood a distance away.

Gaylan observed that defendant was short and had braided hair. He was wearing a light coat and a brimless hat. Gaylan recognized defendant from seeing him at Nina's apartment once in the past. Gaylan was in a hurry to get home and he told Mario, "Come on, let's go...." Defendant told Gaylan, "Hey OG, just go on," suggesting Gaylan walk ahead and let them talk. Gaylan said, "Yeah, sure." As Gaylan walked ahead, he heard defendant ask Mario, "Why didn't you call me?" Mario answered, "My phone was broke." Defendant told Mario there were other phones he could have used. Mario told defendant, "You can keep the ID," or something to that effect. Mario was trying to reason with defendant, explaining why he had not contacted him. Gaylan knew defendant's cell phone was not broken because Liz had just called him. Defendant and Mario were talking loudly and gesturing with their hands. Gaylan thought defendant was getting mad at Mario.

Gaylan walked around the corner, then walked back to see if Mario was coming. As defendant and Mario came into view again, Gaylan saw defendant walking back toward Mario, away from Deidra, who was standing at a distance. Defendant was acting "bold and puffy-like," and he appeared even angrier than before. Mario was bigger than defendant, and it struck Gaylan as odd that defendant was acting so bold and unconcerned about Mario's size. Gaylan thought defendant must have a weapon. At that point, Gaylan heard two or three gunshots and he ducked. Defendant was about five feet from Mario when the shots were fired. When Gaylan looked up, he saw Mario running, and he took off too. They ran side-by-side until Mario turned to the south and Gaylan ran to the north.

Deidra, who had been walking away when she heard the shots, took off running too. She ran through an apartment complex, then she saw defendant in the street and he told her to come with him. They ran, jumped over a fence, and hid in an open garage.

Just moments earlier, around 3:00 a.m., Bryant had driven into the neighborhood. He worked nearby and decided to park in the residential area, rather than in his work lot. As he sat in his car and gathered his things, he heard a noise like a firecracker. He saw three men running toward his car. Mario and Gaylan were running side-by-side, and defendant was running about 10 or 15 feet behind them. Defendant slowed down, raised his arms, and assumed a shooting stance. He was about 30 or 40 feet from Bryant. The street lights allowed Bryant to see defendant's physique, but not his face. When Bryant saw defendant assume a shooting stance, he ducked down in his car and heard shots fired. Bryant saw one of the men running past his car. When Bryant sat back up, he saw defendant running in the opposite direction and away

from his car.  Mario and Gaylan had split up and run in different directions.  Bryant was in shock, but he started his car and made a U-turn.  As he turned onto another street, Mario jumped in front of his car, waving his arms and screaming at him to stop. Bryant pulled over to help him.  There was blood everywhere, but Bryant could not see Mario's wound. He had Mario sit down and he called 911.  Mario was conscious and speaking to him the entire time Bryant was with him and talking to the 911 dispatcher.  Bryant repeatedly tried to reassure Mario.  Bryant did not ask Mario who shot him, and Mario did not make any voluntary statements identifying the shooter.

Mario had been shot once in the front lower neck.  The bullet hit his clavicle and was deflected downward, causing significant damage to his subclavian artery and vein and lodging in his lung.  As a large amount of blood accumulated in Mario's chest cavity, he began having trouble breathing.

When Officer Nichols arrived, Mario was rolling around on the ground, repeatedly saying he could not breathe.  He was covered with blood, in distress, and laboring to breathe.  Nichols did not ask Mario any questions.  When medical personnel arrived, they transported Mario immediately.  Nichols went to the hospital and was informed that Mario had not survived.  Nichols collected Mario's cell phone.

Mario's left chest cavity had filled with about 1,300 milliliters of blood, which prevented him from breathing.  His blood contained 0.16 percent alcohol and was positive for marijuana and a metabolite of cocaine.

Between 3:00 and 3:30 a.m., a man who lived in an apartment near the shooting called 911 because he saw defendant and Deidra trying to jump over his apartment fence. Defendant was wearing a white shirt, blue jacket, and shorts.  His hair was in dreadlocks.  Deidra was wearing a red shirt and white jeans.  When the man's dog pursued defendant, he and Deidra went into a garage, where they stayed for about 10 minutes, then walked out.

After officers arrived, a crime scene technician observed blood at various points tracking Mario's movements, a Winchester .25–caliber automatic cartridge casing, a bloody DVD, and a pouch of Bugler tobacco.  At 3:45 a.m., an officer observed that the lighting was very good in the area of the shooting.  Across the street, officers found gloves, and about one-half block away, they found a baseball cap.

At about 4:30 a.m., when Nina realized that the police were outside, she tried to call Mario's cell phone to ask if he and Gaylan had seen anything, but Mario did not answer.  She assumed he had turned his phone off.

Later that day, Detective Benson examined Mario's cell phone and determined that Nina was the last person Mario had texted.  Benson went to Nina's apartment and told her Mario had been killed.  Nina told Benson about the various people who had been at her apartment when Mario was there, and she told him that Mario owed defendant money.

Benson also went to Liz's apartment and told her Mario had been killed.  Liz then told Gaylan and they talked about hearing the ambulance.  Gaylan told her about the shooting and said he thought defendant was the person who talked to Mario.  When Benson interviewed Gaylan that day, he identified defendant from a photographic lineup.

The next day, April 25, around 11:30 a.m., the police received a call, informing them that defendant was inside a particular residence with a gun.  Benson deployed patrol units and the SWAT Team.  The family, including two small children, was ordered out of the house, and defendant eventually exited peacefully.  His hair was in braids or "dreads."  Inside the house, officers recovered a black and brown .22–caliber handgun, which was not the murder weapon.  Officers also found a patterned, white-and-blue hooded jacket.  Benson collected the jacket

4

because he believed it was similar enough to the descriptions that it could have been the one worn during the shooting. Benson showed the jacket to the family and they told him it belonged to defendant and he was wearing it when he arrived at the house. Defendant was arrested and booked into jail. The next day, he changed his hairstyle by shaving off his long hair.

On May 3, Benson came to Deidra's house. Deidra was at school, but Benson spoke to Deidra's mother, Tina, for about 15 minutes. He asked Tina if she had any information about the homicide. She said she did. She was very emotional and she expressed her concerns about Deidra. Tina said she first heard about the homicide on the news. Then a few days later, a family member told her Deidra was involved. Tina was concerned, so she sat Deidra down and talked to her. Deidra told her she was present when the homicide occurred, she had witnessed a man getting shot, and she felt really bad about it. Deidra said the shooting was about drugs and Mario owed defendant money. Deidra did not say that she actually saw defendant shoot Mario, but she said everything happened so fast and was out of her control. She did not think it would happen that way. Deidra said that about three weeks before the shooting, defendant told her if Mario did not pay him back, things would get ugly.

Tina had been hearing things on the street and she was concerned that the gun was hidden inside her home. She searched her home several times, but was unable to find the gun. When she questioned Deidra, she said the gun was not there.

Tina had noticed changes in Deidra since the shooting. She was having trouble sleeping and she asked about going to church. Deidra told Tina that "witnessing the shooting was messing her up."

While Benson was at Deidra's house, Tina sent someone to pick up Deidra from school. Benson asked that no one mention his presence to Deidra. When Deidra arrived home, Benson introduced himself and told her why he was there and that he needed to talk to her. She was surprised to see him and she immediately lowered her head and started to cry. Deidra told Benson she did not have any information at all. As they talked in Tina's presence, Benson told Deidra he had spoken with her mother. Upon hearing that, Deidra immediately stared at Tina, and Benson sensed a lot of tension between them. He told Deidra, "Let me just explain to you what's going to happen." She said, "Where?" He said, "Anywhere in the house that you feel comfortable." At that point, she led him down the hallway into her bedroom. Benson told her he needed to speak to her about the homicide. He said he had already spoken with her mother and he needed to speak to her. They were in the bedroom for just a few minutes.

Benson asked both Deidra and Tina if they would go to police headquarters with him to have their interviews recorded, as Benson had done with almost all the witnesses in the case. Tina told Benson she had a long-standing appointment with "county aid" and she was not going to miss it. When Benson told Tina (in Deidra's presence) he needed to interview Deidra at headquarters, Tina asked him to take Deidra there, interview her, and bring her back home when he was done.

Benson drove Deidra to headquarters and she sat in the front seat of his vehicle, which in Deidra's opinion was not a police car. They parked, walked into the building, and Benson showed her to a room. He closed the door and they spoke alone. When Benson interviewed Deidra, he showed her a photograph of defendant and she identified him. Then Benson showed her a photograph of Mario and asked her if she knew who he was. She said she did not. Benson asked, "You never seen that person before?" She said, "That dude got killed right?" She said she did not know him though. He asked if she had seen him and she answered, "That night." Benson said, "You saw him that night? Okay." Benson took her answers to mean that she recognized Mario from that night, but she did not know him and had not seen him before that night. Deidra said, "Can I wait until my mom get here?" Benson answered, "Your mom already told me to bring you down here and talk to you." Benson told Deidra that a witness thought she handed defendant a gun. She insisted that she did not have a gun. She never

touched the gun.  She said Mario and another man were walking away from Nina's apartment, and she and defendant were walking toward Nina's apartment.  When they met, she and defendant laughed at Mario and the other man because they were high and arguing with each other.  Mario and the other man started getting mad.  Then defendant told Mario, "[D]on't you owe like some money anyways."  He repeated, "You owe me some money[.]"  Mario told defendant he was going to pay him, but he could not pay him at that time. (Deidra already knew Mario owed defendant money because she had overheard a conversation at Nina's apartment in which defendant asked Nina where Mario was.)  The three men started arguing about petty things.  Deidra wanted to leave, which made defendant mad.  Deidra turned and walked away.  After walking a short distance, she heard gunshots.  She took off running through a parking lot and an apartment complex, and she hid under a staircase.  She saw defendant and he told her to come with him.  They ran until they found an open garage.  While they were hiding in the garage, they heard sirens.  She was scared.  She did not know who got shot or if someone might be after them because they were involved in the shooting.  When Benson asked how she was involved with the shooting, she said, "Because I was there when it happened."  She said, "I was with him and I knew he had something to do with it 'cause he ran."  She explained she did not see the shooting, but just heard the shots as she was walking away.  They stayed in the garage for a while without speaking, then walked all the way around the area, going through some new houses and a field to avoid the police.  She and defendant talked once or twice on the telephone after the shooting.  They thought the telephones were tapped.  She told Benson she did not know if defendant was the shooter, but she had told Tina she thought defendant did it.  She also told Tina it happened so fast and she just ran. Tina told her there had better not be a gun in their house.  Deidra assured her there was not, but Tina searched the house anyway.  Deidra told Benson the shooting had changed her; she had not been the same since she heard the shots fired.

After the interview, Benson took Deidra to the crime scene and asked her to identify various locations for him.  She showed him where defendant spoke to Mario and Gaylan, and where she stood a distance away from them.

Benson took Deidra home, but Tina was not there.  Benson called Tina several times and left messages.  He and Deidra sat outside the house for about five minutes, then Benson took her back to school and signed her in.  He never arrested Deidra or charged her with any crimes.  He never threatened to arrest her.

(LD 4, pp. 3-7).

## II.   DISCUSSION

### I.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v.

1  Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997);  Jeffries v. Wood,

2  114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds*

3  *by* Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's

4  enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed

5  by its provisions.

6       II.     Legal Standard of Review

7       A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the

8  petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was

9  contrary to, or involved an unreasonable application of, clearly established Federal law, as determined

10  by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an

11  unreasonable determination of  the facts in light of the evidence presented in the State court

12  proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S.

13  at 412-413.

14       A state court decision is "contrary to" clearly established federal law "if it applies a rule that

15  contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts

16  that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."

17  Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000).

18       In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court

19  explained that an "unreasonable application" of federal law is an objective test that turns on "whether

20  it is possible that fairminded jurists could disagree" that the state court decision meets the standards set

21  forth in the AEDPA. The Supreme Court has "said time and again that 'an *unreasonable* application of

22  federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct.

23  1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court

24  "must show that the state court's ruling on the claim being presented in federal court was so lacking in

25  justification that there was an error well understood and comprehended in existing law beyond any

26  possibility of fairminded disagreement."  Harrington, 131 S.Ct. at 787-788.

27       The second prong pertains to state court decisions based on factual findings.  Davis v.

28  Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a

federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500. A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Furthermore, where a habeas petition governed by the AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard. Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002); Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

**III.    Review of Petitioner's Claims**

Petitioner alleges the following as grounds for relief: (1) prosecutorial misconduct in allegedly making disparaging remarks about defense counsel; (2) prosecutorial misconduct in misstating the law of second degree murder; (3) failure of trial court to cure prosecutor's misconduct; (4) admission of irrelevant gun evidence; (5) admission of witness's involuntary pretrial statement; (6) ineffective assistance of counsel; and (7) cumulative error.

A.    Prosecutorial Misconduct: Remarks About Defense Counsel

Petitioner first contends that the prosecutor committed misconduct by making disparaging remarks to the jurors about his attorney. This contention is without merit.

8

1.   The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim in the following way:

Defendant asserts that the prosecutor committed prejudicial misconduct under state law by denigrating defense counsel in front of the jury, arguing repeatedly and at length that defense counsel's duty to protect his client, even by obscuring the truth, conflicted with a prosecutor's duty to seek the truth.  Defendant further contends the prosecutor committed misconduct of federal constitutional dimensions by making disparaging remarks about defense counsel's use of leading questions during cross-examination to confuse witnesses and obscure the truth.  We conclude the prosecutor's arguments did not amount to misconduct, and if they did, the misconduct was harmless.

**A. Law**

It is improper for a prosecutor to attack the integrity of defense counsel or cast aspersions on defense counsel.  (Hill, supra, 17 Cal.4th at p. 832.)  Thus, a prosecutor may not accuse defense counsel of fabricating or manipulating evidence.  (People v. Bemore (2000) 22 Cal.4th 809, 846; People v. Thompson (1988) 45 Cal.3d 86, 112.)  And a prosecutor may not argue that defense counsel believes his client is guilty or that defense counsel is allowed or obligated to present a defense dishonestly.  (People v. Bell (1989) 49 Cal.3d 502, 537–538.)

But " " "a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' [Citation.] 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness' " [citation], and he may "use appropriate epithets...." ' " [Citation.]' [Citation.]"  (Hill, supra, 17 Cal.4th at p. 819.)

Thus, a prosecutor may give his or her opinion on the state of the evidence, vigorously attack the defense case, and focus on the deficiencies in defense counsel's tactics and factual account.  (People v. Redd (2010) 48 Cal.4th 691, 735; People v. Padilla (1995) 11 Cal.4th 891, 945–946, *disapproved on another ground* in Hill, supra, 17 Cal.4th at p. 823, fn. 1.)  A prosecutor may argue that "defense attorneys never admit their clients' guilt" and always argue the existence of a reasonable doubt.  (People v. Coulter (1989) 209 Cal.App.3d 506, 514; People v. Williams (1996) 46 Cal.App.4th 1767, 1781 [defense counsel had to " 'manufacture doubt even where none exist[ed.]' "].)  And a prosecutor may remark on strategies that are simply part of defense counsel's arsenal of tactics to persuade the jury to favor the defendant, and a prosecutor may use colorful language to criticize defense counsel's tactical approach when the language is not a personal attack on defense counsel's integrity.  (People v. Zambrano (2007) 41 Cal.4th 1082, 1154–1155 [defense counsel's argument was a " 'lawyer's game' and an attempt to confuse the jury by taking the witness's statement out of context"], disapproved on other grounds in People v. Doolin (2009) 45 Cal.4th 390, 421, fn. 22; People v. Stitely (2005) 35 Cal.4th 514, 559 [jurors should "avoid 'fall[ing]' for [defense] counsel's argument" and should view it as a " 'ridiculous' attempt to allow defendant to 'walk' free," and a " 'legal smoke screen' "]; People v. Young (2005) 34 Cal.4th 1149, 1193 [prosecutor's characterization of defense counsel's argument as " 'idiocy' " was fair comment on counsel's argument]; People v. Taylor (2001) 26 Cal.4th 1155, 1167 [reference to "defense 'tricks' or 'moves' used to demonstrate a witness's confusion or uncertainty"]; People v. Medina (1995) 11 Cal.4th 694, 759 [" 'any experienced defense attorney can twist a little, poke a little, try to draw some speculation, try to get you to buy something' "].)

"An argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper."  (People v. Cummings (1993) 4 Cal.4th 1233, 1302, fn. 47; People v. Marquez

9

(1992) 1 Cal.4th 553, 575–576 [referring to defense as a "'smokescreen'"]; People v. Breaux (1991) 1 Cal.4th 281, 305 ["'If you don't have [the law or the facts] on your side, try to create some sort of a confusion'"]; People v. Bell, supra, 49 Cal.3d at p. 538 [defense counsel's job is to focus on areas that raise confusion and "'[i]t's his job to throw sand in your eyes, and he does a good job of it'"]; People v. Williams, supra, 46 Cal.App.4th at p. 1781 [defense counsel had to "'obscure the truth' and confuse and distract the jury" and "counsel's argument was not made in 'pursuit of the truth' but was instead meant to 'deceive,' 'distract,' and 'confuse' the jurors"]; People v. Goldberg (1984) 161 Cal.App.3d 170, 190 [defense counsel's "job" is to confuse the jury about the issues].)  Such comments can be "understood as a reminder to the jury that it should not be distracted from the relevant evidence and inferences that might properly and logically be drawn therefrom." (People v. Bell, supra, at p. 538.)

In People v. Gionis (1995) 9 Cal.4th 1196 (Gionis), "[a]fter noting that defense counsel was arguing out of both sides of his mouth, the prosecutor stated ... that this was an example of 'great lawyering' which 'doesn't change the facts, it just makes them sound good.' [¶] The prosecutor then read three classic quotations about lawyers: '[¶] "Lawyers and painters can soon change white to black. Danish Proverb." [¶] "If there were no bad people there would be no good lawyers." Charles Dickens. [¶] "There is no better way of exercising the imagination than the study of law. No poet ever interpreted nature as freely as a lawyer interprets truth." Jean Giraudoux, 1935.'" (Id. at pp. 1215–1216, fn. omitted.) The prosecutor added this fourth quotation: "'"You're an attorney. It's your duty to lie, conceal and distort everything and slander everybody."'" (Id. at p. 1216.) And then "the prosecutor read one last quotation by Shakespeare: 'In law, what plea so tainted and corrupt but being seasoned with a gracious voice, obscures the show of evil.'" (Ibid.)

The Supreme Court concluded: "[N]o impropriety appears in this case. Taken in context, the prosecutor's remarks simply pointed out that attorneys are schooled in the art of persuasion; they did not improperly imply that defense counsel was lying. With regard to the prosecutor's fourth quotation, we agree that it constituted improper argument, even though it was directed at attorneys generally, and thus to the prosecutor himself as well as defense counsel. Nonetheless, the trial court's prompt admonishment adequately corrected any misconceptions that could have been conveyed to the jury." (Gionis, supra, 9 Cal.4th at pp. 1216–1217, fns. omitted.)

The Gionis court distinguished People v. Hawthorne (1992) 4 Cal.4th 43, the case upon which defendant relies here, as follows: "In People v. Hawthorne, supra, the prosecutor pointedly argued that, while the state was obligated to present the truth and to make sure no innocent person was convicted, defense counsel was expected and permitted by law to disregard the truth in defense of his client. [Citation.]  Those comments were clearly objectionable because they suggested that counsel was obligated or permitted to present a defense dishonestly. [Citation.] Here, however, the quotations did not seek to distinguish between the roles of the prosecutor and defense counsel and did not imply that counsel was offering a dishonest defense.  In the context of this case, we are satisfied that the remarks properly served to remind the jury to focus on the relevant evidence and to not be swayed by argument alone. [Citation.]" (Gionis, supra, 9 Cal.4th at pp. 1216–1217, fn. 13.)

**B. Facts**

  During argument, the prosecutor stated:

  "You should convict when you've considered and compared all of the evidence, not just one line of a transcript taken out of context.  And we had a lot of that.  Not twisting what was said to the meaning Defense wants it to have, but how it was actually used on the tape.  Because if you take the line without the inflections, without everything else taking place, without what is going on before it, and what's taking place behind it, it is meaningless. It is that piece of [the] puzzle that you can turn it into anything you want to turn it into. [¶] Not giving the statements the inflection Defense wants them to have so

10

that there's some evil sense conveyed about what's really taking place.  Ladies and gentlemen, you have a transcript.  It's a great tool.  But it's no substitute for the audio."

Defense counsel began his argument as follows:

"There were moments as I listened to the very fine presentation by the Prosecution in closing argument that I felt I was witnessing a bulldozer in action. You know, they asked the question, where can reasonable doubt be found?  The answer is, that reasonable doubt is found in unexpected places, and at unexpected moments, like blades of grass, like little trees, little saplings coming out of the ground.  And the task of the Prosecution at times seemed to be to function like a bulldozer simply flattening the earth in a very smooth plane and saying it's easy, it's simple, there's nothing here. There's no reasonable doubt here.  Just go on and make the easy decision."

Later, defense counsel argued:

" ... The Prosecution can't admit to doubt, because if they do, you're going to find him not guilty. So they have to attempt to erase all doubt. And that's their job, and I understand that. But there are questions here regarding some of these witnesses that just will not go away. Let's turn to some of those."

And defense counsel also argued:

" ... So, again, facts that are stubborn things, facts that are stubborn things and simply will not neatly be bulldozed out of existence by [the prosecution's] very powerful Power[P]oint [slide] presentation. This just doesn't go away."

On rebuttal, the prosecutor used another PowerPoint slide presentation and argued:

"This is a rebuttal argument.  I address issues raised by Counsel.  I'm going to look at the reasonableness of the evidence, and consider what the Defendant—what must be true for the Defendant to be not guilty.

"So first question you have to ask [y]ourselves is, did the Defense try to sidetrack you? What do we mean by that?  Was there an attack on the law?  Was there an attack on witnesses?  Was there an attack on the evidence?  The officers?  Ask you to ignore common sense?  And throw up red herrings.

"So why put up something as an issue if it's not?  Why not address the things that are issues?  Why would that occur in a trial?  Why would that occur from a defense attorney in a case like this?

"Every single person has a right to a jury trial.  The guiltiest defendant in the world is entitled to their day in court.  They're entitled to a lawyer.  And ... that lawyer has an obligation to zealously defend their client.

"What do you do if every single witness, every piece of evidence, points at your client? What do you do?  You got to do something.  You point the evidence away from your client.  Or if there's no evidence to point away from your client, you try to create a distraction.  [']Ladies and gentlemen, look over here, don't look at the Defendant, don't look at the chair he's sitting in, and by all means don't look at the witness stand where the evidence came from.  Look somewhere else.  Look over here.[']  The lawyer must distract you from the evidence that proves his client is guilty.  He can't say, [']wow, he did it, you got him, darn, let's go home.[']"

At this point, defense counsel objected on the ground of prosecutorial misconduct, and the court

11

overruled the objection.  The prosecutor continued:

"So he attempts to create other issues for you to focus on. And defense told us in opening statement that's what he was going to do. In opening statement he told us about Nina's two statements; right? Remember that?  And [']you can't trust her, because those two statements were night and day.[']  And [that's] true, they were night and day. But does that have a single thing to do with whether or not she told the truth in this case? Not a lick.  Because she was never asked questions where she gave conflicting statements. But that's what the impression that Counsel wants you to believe. That's what he wants you to accept as true.  What about Liz'[s] two statements?  He's right, they were different too, because he made that same night and day comparison.... But Counsel told us at the beginning that he was going to be having us look somewhere else. Why sidetrack us on issues we don't have to resolve? [Defense counsel] is a highly skilled homicide defense attorney.... [¶] ... [¶] ... [Defense counsel] got Detective Benson to tell you that the statement made by ... Deidra ... didn't occur.  Got him to say on the stand that it's not in the transcript, and it plainly is.  It's right there.  And if you listen to the tape you really hear it, because you hear the voice inflections.... [¶] Now the transcript is a great tool, but it doesn't tell you what's going on at the scene.  But [defense counsel's] a great lawyer, he's great at twisting it, and phrasing it, so that when you ask—answer the question, if you—if he—if you answer his precise question, you will get twisted up real fast. [¶] ... [¶]

"Now does all of that great lawyering shed one iota of truth on anything in this case? No. [']Look the other direction.['] And you know it took you the other direction, because you got the transcripts that tell you what really took place.  So you can take these transcripts, and nitpick them, and twist them, and make witnesses say what you want.  But it doesn't make it true.... [¶] ... [¶]  As [defense counsel] conducted this case there was one thing that occurred over, and over, and over, it was great lawyering, he never asked the witnesses what happened. That's the last thing in the world he wants to do.  Because every witness in all of the evidence is against him.  So the last thing you do is ask the witnesses what happened.... He's putting a big song on and a dance on and a nice routine and he's working and pounding that witness, but he's not asking a single question that answers anything about what that witness saw or didn't see.  Great lawyering.  Because the last thing in the world—all right.  How many times during Counsel's closing argument did he say, [']well, it could have been this, or it could have been this, we don't know for sure, but that's reasonable doubt; right?['] That's why he asked the questions.  That's the point.  Unless you don't want to ask the questions. Unless you don't want the answer.  So you argue about the transcript, not what did they see, what did they say, what did they do, test them on their ability to hear, see, perceive, all those factors that you use to evaluate a witness.  It's great lawyering, but it's not a search for the truth, because it's not Counsel's job.

"You want to know what's really there, listen to the tape.  Use the transcript to read along. But listen to the inflections, listen to what's said.  Listen to the full thing. [¶] If you phrase a very narrow question, focused on one point, and it's a 'Yes' or 'No' question, you can get a witness to say anything in the world you want them to say. It just depends on what your skill is as a questioner.  But it has no bearing on a search for the truth.  It has no bearing on testing the veracity of a witness.  It has no bearing on what they saw or didn't see.  But that's a trick.  This lawyer magic only works if the witness is diligently trying to answer the exact question posed. [¶] ... And with a good, skilled questioner, good stuff.  You can twist, and turn, and poke, and prod all you want, and create all sorts of illusions and wisp of something sinister going on without a single shred of actual proof, or actual evidence, or any actual testimony on that issue. It's all illusion. [¶] ... Big whoop.  Who cares.  Does that have anything at all to do with, did this man kill our victim?  Was there a drug deal that precipitated that?  No.  It's putting on a big show.  It's putting on a big dance.  It's impressing everyone, wow, look how

12

aggressive he is.  He is going after all of these witnesses.  And look how uncooperative they are.  They can't answer these questions.  Obviously they don't know anything. [As Nina told defense counsel during cross-examination, ']Quit twisting my words, ask questions that apply.[']"

At this point, the prosecutor showed a slide entitled "Cross–Exam as a Search for Truth vs. Attacks on Witness to Confuse the Issues by Very Skilled/Experience[d] Attorney."  Also on the slide was a photograph of a man in a suit holding two of three upside down Styrofoam cups, as if playing a shell game.  The man's head was cropped off the photograph. The prosecutor continued his argument:

"Is this cross-examination as a search for the truth, or attacks on witnesses to confuse the issues by a very skilled, experienced attorney?  And it's the latter.  Were the questions designed to determine the truth of what happened on April 24th?  Absolutely not.  Were the questions designed to confuse or twist the witnesses' statements so that they appeared to lie?  Oh, yeah.  Were the questions on relevant issues or immaterial, trivial nonsense dressed up as important?  What's the—one of my favorite ones here where—were one of our first attacks on [Detective Benson].  [']In the—in the report you say that coat matches the description, but in court you testified it was possibly the coat.  You are a liar sir.[']  Somebody want to explain to me the difference, because I'm not seeing it?  That's ridiculous.  And that's this big smoking gun that Counsel's got to say his client's not a murderer?  But he's got to argue something.  And it's—I'm not faulting him.  He's doing his job.  He's doing it admirably.  And that's part of the process.  But sometimes your arrows—your arrows, they're gone.  You don't have anything to shoot.  And if there's no arrows in your quiver, if you don't have something to actually go after, you have to create something.  And that's what this trial has been about. Creating issues.

"And the voice inflections. I love that Nina caught him on it. Because I've been sitting her[e] cringing during this whole trial while this was taking place. Nina said, [']I don't sound like that,['] or something to that effect. But the questions of attorneys aren't evidence."

The next slide was entitled "Cross Exam as Smoke, Illusion and Sl[e]ight of Hand," and it included the same photograph of the man holding the cups.  The prosecutor continued:

"... And if you look at the evidence, the answers that came from the stand, what were they?  rom the Defense? It was confusion.  And it was intentional confusion. Smoke, illusion, and sl[e]ight of hand.... Is that a search for the truth?  Did he ask him anything about it other than what they told [Detective Benson]? No. It's an illusion. It's vapor. It's smoke.  It gives the appearance that there's something sinister going on.  And if you had that feeling, [']wow, it seems like this is odd, they are not being honest. ['] That's the objective.  But it wasn't evidence because there was no evidence coming from that.

"So how do you—what is a juror to use? Evidence and facts.  So how do you address smoke and vapor in a counter argument?  Because that's what the case was built on from a defense perspective.  The only way you do it is you pull back the veil.  You show what's behind the curtains.  You show the little guy running the—you know, the scene from the Wizard of Oz where they pull back the curtains and there is the guy with the bells and the levers pretending to be the great Wizard of Oz, because that is what was going on. [¶]  Now I'm reminded of the movie Harry Potter.  In Harry Potter there's this creature called a Bogart.  And it assumes whatever your worst fears are.  And whatever your fears are, it becomes.  So if I was afraid of a snake, and there was one here, a snake would pop out of my bag.  Oh, oh, oh.  And the way you get rid of this is you pull out your little magic wand and the spell is [']ridiculouso, ['] also known as [']ridiculous.[']  And I would suggest that as you listen to some of those arguments Counsel [was] making that you use that wand and try it out for size, because I think if you do you're

going to find that most of them are ridiculous."

The prosecutor turned to an analysis of specific defense arguments and their deficiencies, then discussed the evidence that proved defendant's guilt.

The next day, outside the presence of the jury, defense counsel stated his objection on the record.  The trial court noted that the prosecutor repeatedly praised defense counsel and remarked on his great lawyering.  Finding no prosecutorial conduct, the court denied the objection.

**C. Analysis**

After reviewing the entire record, we conclude the prosecutor's remarks—that defense counsel's job was to zealously defend defendant; that the defense relied on tactics of distraction; that defense counsel did his job admirably with great lawyering and skillful questioning; that he created issues, twisted answers on cross-examination, and used illusions, smoke and vapor (including the shell game photograph); and that he made ridiculous arguments and diverted the jury's attention away from relevant facts and a search for the truth—were a fair comment on the defense tactics used at trial and did not improperly imply that defense counsel was lying or was obligated or permitted to present a defense dishonestly.  The remarks were partially in response to defense counsel's argument that the prosecution could not admit to doubt because the prosecution's job was to try to erase all doubt, an argument in which counsel characterized the prosecutor as a bulldozer, trampling reasonable doubt and stubborn facts, and flattening the case into a smooth plane of simplicity that left only an easy decision for the jury.  We believe the jury viewed these dueling comments, at least to some extent, as equivalent rhetorical strikes.  Furthermore, as our review of relevant case law demonstrates, courts have found remarks more egregious than the prosecutor's remarks in this case "not [to] exceed the bounds of permissible vigor."  (Gionis, supra, 9 Cal.4th at p. 1218.)  The challenged remarks were within the wide latitude allowed the prosecutor in describing the deficiencies in defense counsel's tactics and factual account.  (People v. Redd, supra, 48 Cal.4th at p. 735.)  Thus, they did not constitute misconduct.

Moreover, even if we were to conclude the remarks did constitute misconduct, we would find them harmless under any standard due to the overwhelming evidence against defendant, as we have explained previously.  (Chapman, supra, 386 U.S. at p. 24; Watson, supra, 46 Cal.2d at p. 836.)

(LD 4, pp. 21-30).

       2.  Federal Standard.

Under clearly established federal law, a prosecutor's improper comments will be held to violate the Constitution only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Parker v. Matthews, ––– U.S. ––––, ––––, 132 S.Ct. 2148, 2153, 183 L.Ed.2d 32 (2012) (per curiam) (quoting Darden v. Wainright, 477 U.S. 168, 181–183, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)); see Sassounian v. Roe, 230 F.3d 1097, 1106 (9th Cir.2000).  Prosecutorial misconduct deprives the defendant of a fair trial as guaranteed by the Due Process Clause if it prejudicially affects the substantial rights of a defendant.  United States v. Yarbrough, 852 F.2d 1522,

14

1539 (9th Cir.1988) (citing <u>Smith v. Phillips</u>, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)).

The standard of review of claims concerning prosecutorial misconduct in a § 2254 proceeding is the narrow standard of due process, and not the broad standard that applies in the exercise of supervisory power; improper argument does not, per se, violate a defendant's constitutional rights. <u>Mancuso v. Olivarez</u>, 292 F.3d 939, 957 (9th Cir.2002) (citing <u>Thompson v. Borg</u>, 74 F.3d 1571, 1576 (9th Cir.1996)). This Court must thus determine whether the alleged misconduct has rendered a trial fundamentally unfair. <u>Darden v. Wainwright</u>, 477 U.S. at 183. It must be determined whether the prosecutor's actions constituted misconduct and whether the conduct violated Petitioner's right to due process of law. <u>Drayden v. White</u>, 232 F.3d 704, 713 (9th Cir.2000).

To grant habeas relief, this Court must conclude that the state court's rejection of the prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Parker v. Matthews</u>, 132 S.Ct. at 2155 (quoting <u>Harrington v. Richter</u>, 131 S.Ct. at 767–87). The standard of <u>Darden v. Wainwright</u> is a very general one that provides courts with more leeway in reaching outcomes in case-by-case determinations. <u>Parker v. Matthews</u>, 132 S.Ct. at 2155 (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)).

In determining whether the prosecutor's remarks rendered a trial fundamentally unfair, the remarks must be analyzed in the context of the entire proceeding. <u>Boyde v. California</u>, 494 U.S. 370, 385 (1990); <u>Darden</u>, 477 U.S. at 179–182. Furthermore, counsel are "given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." <u>Ceja v. Stewart</u>, 97 F.3d 1246, 1253–1254 (9th Cir.1996) (quoting <u>United States v. Baker</u>, 10 F.3d 1374, 1415 (9th Cir.1993)). A reviewing court should consider challenged remarks in light of the realistic nature of closing arguments at trial. "Because 'improvisation frequently results in syntax left imperfect and meaning less than crystal clear,' 'a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.'" <u>Williams v. Borg</u>, 139 F.3d 737, 744 (9th Cir.) (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 646–647 (1974)), cert. denied, 525 U.S. 937 (1998). Finally,

even when prosecutorial misconduct rises to the level of a due process violation, such misconduct provides grounds for habeas relief only if that misconduct is prejudicial under the harmless error test articulated in Brecht v. Abrahamson, 507 U.S. 619, 637–638 (1993). Shaw v. Terhune, 380 F.3d 473, 478 (9th Cir.2004).

Factors to be considered in determining whether habeas corpus relief is warranted include whether the prosecutor manipulated or misstated the evidence; whether his comments implicated other specific rights of the accused; whether the objectionable content was invited or provoked by defense counsel's argument; whether the trial court admonished the jurors; and the weight of evidence against the defendant. Darden, 477 U.S. at 181 (quoting Donnelly, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). "[T]he Darden standard is a very general one, leaving courts 'more leeway ... in reaching outcomes in case-by-case determinations [ ]' (Yarborough v. Alvarado, 541 U.S. 652, 664, (2004)) ...." Parker v. Matthews, ––– U.S. ––––, ––––, 132 S.Ct. 2148, 2155 (2012). Thus, even where a prosecutor's argument, questions or behavior are found improper, relief is limited to cases in which a petitioner can establish that the misconduct resulted in actual, substantial prejudice.

3. Analysis.

Here, the 5th DCA considered the entire context of the trial, including comments by the prosecution that defense counsel was sidetracking and distracting the jury, that counsel, by "inflections," was "twisting" the meaning of evidence, that counsel was putting on a "big show" with "sleight of hand." Then the state court concluded that such epithets and characterizations were "fair comment on the defense tactics used at trial and did not improperly imply that defense counsel was lying or was obligated or permitted to present a defense dishonestly."

In the Court's view, Petitioner's objections regarding the prosecutor's comments about defense counsel and the validity of Petitioner's defense do not amount to a due process violation as "[c]riticism of defense theories and tactics is a proper subject of closing argument." See United States v. Sayetsitty, 107 F.3d 1405, 1409 (9th Cir.1997) (citation omitted). Prosecutors have taken far more egregious shots at defense counsel and have been found not to have committed misconduct. See e.g., U.S. v. Del Toro–Barboza, 673 F.3d 1136, 1151 (9th Cir.2012) (characterizing defense strategy as "the Wizard of Oz trick"); United States v. Ruiz, 710 F.3d 1077, 1086 (9th Cir.2013) (characterizing defense case as

"smoke and mirrors" directed to defense case and not counsel); <u>Williams v. Borg</u>, 139 F.3d 737, 744–45 (9th Cir.1998) (calling defendant's argument "trash" not misconduct; "He did not say the man was 'trash'; he said the argument was. A lawyer is entitled to characterize an argument with an epithet as well as a rebuttal."); <u>United States v. Bernard</u>, 299 F.3d 467, 487-88 (5th Cir.2002) (rejecting a challenge to a prosecutor's closing argument that accused the defense of trying "to get someone on this jury to ... take a red herring"); <u>but see, United States v. Sanchez</u>, 659 F.3d 1252, 1224 (9th Cir.2011) (misconduct where the prosecutor argued: "the defense [counsel] in this case read the records and then told a story to match the records. And ladies and gentlemen, I'm going to ask you not to credit that scam that has been perpetrated on you here."). For these reasons, this claim should be rejected.

B. <u>Prosecutorial Misconduct: Misstatement of Law</u>

Second, Petitioner contends that the prosecutor misstated the law of second degree murder and of provocation, thus depriving him of a fair trial. Petitioner is incorrect.

1. <u>The 5th DCA's Opinion.</u>

The Court of Appeal rejected Petitioner's argument as follows:

Defendant contends the prosecutor committed misconduct by misstating the law of provocation and second degree murder. The People concede the prosecutor apparently misspoke, but maintain the error was harmless. We agree the error was harmless.

**A. Law**

It is improper for the prosecutor to misstate the law, and even an innocent misstatement of law can constitute misconduct. (<u>People v. Hill</u> (1998) 17 Cal.4th 800, 822, 829–832 (<u>Hill</u>), *overruled on another ground* in <u>Price v. Superior Court</u> (2001) 25 Cal.4th 1046, 1069, fn. 13.)

A prosecutor's remarks can so "'"so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process."' [Citations.]" (<u>People v. Frye</u> (1998) 18 Cal.4th 894, 969.) In such cases, the misconduct amounts to federal constitutional error and reversal is required unless we conclude the misconduct was harmless beyond a reasonable doubt. (<u>People v. Estrada</u> (1998) 63 Cal.App.4th 1090, 1106–1107, citing <u>Chapman v. California</u> (1967) 386 U.S. 18, 24 (<u>Chapman</u>).) If the prosecutor's remarks did not rise to that level, we will not reverse unless we conclude it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the misconduct. (<u>People v. Barnett</u> (1998) 17 Cal.4th 1044, 1133, citing <u>People v. Watson</u> (1956) 46 Cal.2d 818, 836 (<u>Watson</u>).)

In considering whether a defendant was harmed by the misconduct, we examine the prosecutor's remarks in the context of the whole record, including arguments and instructions. (<u>Hill, supra</u>, 17 Cal.4th at p. 832; <u>People v. Morales</u> (2001) 25 Cal.4th 34, 44.) "When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.]" (<u>People v. Osband</u> (1996) 13 Cal.4th 622, 717; <u>People v. Boyette</u> (2002) 29 Cal.4th 381, 436 [even if prosecutor misstated the law, "the trial court

17

properly instructed the jury on the law, and we presume the jury followed those instructions"].) Furthermore, overwhelming evidence of a defendant's guilt may render the prosecutor's misconduct harmless.  (See, e.g., People v. Booker (2011) 51 Cal.4th 141, 186; People v. Fields (1983) 35 Cal.3d 329, 363.)

We turn to the law of homicide.  "First degree murder is an unlawful killing with malice aforethought, premeditation, and deliberation. [Citation.]" (People v. Hernandez (2010) 183 Cal.App.4th 1327, 1332 (Hernandez); § 189.)  Malice may be manifested as either an intent to kill (express malice) or an intentional commission of a life-threatening act with conscious disregard for life (implied malice).  (Hernandez, supra, at p. 1332.)  "First degree willful, deliberate, and premeditated murder involves a cold, calculated judgment, including one arrived at quickly [citation], and is evidenced by planning activity, a motive to kill, or an exacting manner of death. [Citation.]"  (People v. Carasi (2008) 44 Cal.4th 1263, 1306.) " 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection." '"  (People v. Koontz (2002) 27 Cal.4th 1041, 1080.)  "[F]or instance, 'an execution-style killing may be committed with such calculation that the manner of killing will support a jury finding of premeditation and deliberation, despite little or no evidence of planning and motive.' [Citation.]"  (People v. Tafoya (2007) 42 Cal.4th 147, 172.)

"Second degree murder is an unlawful killing with malice, but without the elements of premeditation and deliberation which elevate the killing to first degree murder. [Citation.]" (Hernandez, supra, 183 Cal.App.4th at p. 1332.)  Thus, first degree murder may be mitigated to second degree murder where premeditation and deliberation are negated by heat of passion arising from provocation. (Ibid.)  Provocation sufficient to mitigate a murder to second degree murder requires a finding that the defendant's subjective mental state was such that he did not deliberate and premeditate before deciding to kill.  (People v. Fitzpatrick (1992) 2 Cal.App.4th 1285, 1295–1296 (Fitzpatrick).))  Thus, a defendant who was subjectively provoked and therefore unable to deliberate is guilty of second degree murder even if a reasonable person would not have been provoked under the same circumstances. (Ibid.)

Voluntary manslaughter is a killing that has been reduced even further by a greater degree of provocation. (People v. Steele (2002) 27 Cal.4th 1230, 1253.)  To reduce first degree murder to voluntary manslaughter, an objective test is applied.  (Ibid.)  Under that more demanding test, the jury must find not only that the defendant was in fact provoked, but that a reasonable person would have been provoked under the circumstances . (Ibid.)

**B. Facts**

During argument, the prosecutor discussed first degree murder at great length, then turned to second degree murder:

> "How do we know it's not second degree murder?  Remember, that willful, deliberate, premeditated is first [degree].  And if it's not there, it's second.  It was planned.  It was deliberate.  And he killed him.  Period. Defendant didn't suddenly get him angry [sic ]. [']Hadn't thought about this, you know, I just—I wasn't planning to hurt the guy.  I never even thought about doing anything.  I just happened to have my gun with me that day.[']  No.  He was looking for him.  He wasn't suddenly mad.  He had been mad.  He had been looking for him.  And he had been dodged for three weeks by the guy who was supposed to pay him the next day.  He didn't suddenly realize he had a gun in his pocket, and when he said, [']oh, I'm not going to pay you,['] he goes, [']oh, now, is the time.[']  He had that gun ever since he started looking for him.  And it was there for a reason.  Didn't find the gun in his hand and say, [']oh, gee, uh, hmm, I guess since it's here I'll use it.[']  And it wasn't after that first shot where he went, [']well, shoot I shot him once, well may as well try again.[']  This isn't second degree murder.

"Now, there is a jury instruction that says that provocation can reduce a charge of murder from first degree to second degree.  That provocation has to be one that a reasonable person in the same situation would feel the drama of and react violently or aggressively." (Italics added.)

Defense counsel immediately objected, correctly stating: "[T]hat misstates the law. That would be manslaughter, not second degree."

The trial court stated:

"Counsel, let me state this. And hopefully I'll state it for the last time. In fact, it might be appropriate to reread what I read to the jury first thing this morning...."

The court proceeded to re-instruct the jurors that they must follow the law as the court explained it, and not as the attorneys commented on it. Nothing the attorneys say is evidence, including their remarks in opening statements and closing arguments.

The prosecutor then continued with his argument:

"So what provocation do we have in this case?  And is that something that a reasonable person in a similar situation could find themselves in that situation?  Think in terms of, you know, the guy that walks in on his wife and his best friend.  Everybody would be like, [']oh, man, I may do something stupid then.['] It is not what we have here.  This isn't somehow objectively reasonable, we can look at and say, [']well, we don't agree with it, but I kind of understand it.[']" (Italics added.)

At this point, defense counsel objected again and requested a sidebar.  The court denied the request.

The prosecutor continued:

"This is a situation where a guy didn't pay you 20 bucks.  I don't think anybody here looks at it and says, [']gee, if I'm a couple of weeks late on my credit card bill the credit card company gets to come and blow me away. ['] There's nothing about this situation that would allow that reduction from first degree to second degree.  That doesn't apply. That doesn't fit."

During a break outside the presence of the jury, the court allowed defense counsel to state his objection on the record, as follows:

"[B]efore noon, right before noon, at a crucial moment in the Prosecution argument the Prosecution stated that for provocation to reduce a first degree murder to a second degree murder it had to be the kind of provocation that would affect a reasonable person. And I believe the example given by the Prosecution was a husband finding a spouse in bed with another man.  That's a classic manslaughter example.  If we had the kind of provocation in a case that ... the Prosecution is describing, we wouldn't be talking about the difference between first and second degree murder, we would be talking about the difference between murder and manslaughter.  And so to—to imply that that degree of provocation is required is to state incorrectly the law as it relates to provocation.  By definition in this case we're talking about provocation, if any, that's not enough to get us down to a manslaughter, but might be enough to get us down to second degree murder. And that was the misstatement of the law that I was objecting to.  And I'm not saying that it was an intentional misstatement, because I'm not satisfied that it was, but it was incorrect."

The court asked the prosecutor if he had any comments.  The prosecutor stated:

> "I believe my statement was a correct statement of the law.  I know we haven't addressed this issue in its totality yet, because giving of that instruction was to be reserved for later argument.  So I would—not at this point, I don't."

The court noted that it would be instructing with CALCRIM No. 522, as requested by defense counsel, and counsel could address the language of that instruction if the prosecution misstated the law regarding provocation.

During defense counsel's argument, he stated:

> "If you have any questions on the law, if it appears that anything the lawyers have said about the law conflicts with the Judge's instructions, the instructions say, follow the instructions, not what the lawyers say. [¶]  However, both Counsel have devoted a long time to this case.  We've been on it longer than anybody, except for the detective.  And so when we tell you what the law is, and it seems to conflict with what the instructions say, I would urge you to send the Judge a note, say, well, the lawyers say the law is this way, the instructions seem to read a different way, Judge, which is it?  Ask the Judge.  Don't just throw out what the lawyers say.  Because we've been on it for a long time."

Later, after the bulk of his argument, defense counsel turned to the subject of second degree murder:

> "I submit that the Prosecution did not accurately represent to you the distinction between first and second degree murder.  You've received an instruction on provocation, even though there's very little provocation here.  [Mario] did very little, if anything, to provoke the shooter.  He didn't deserve to die.  But you've received an instruction on provocation.  And the Prosecution has used that, in essence, to try to contrast this with what real provocation is.  And to say real provocation isn't here, so you should convict of first degree murder.  Their example was simply wrong.  The finding of one's spouse in bed with somebody else is a classic manslaughter provocation.  It is considered such severe provocation that even somebody who kills intentionally is going to be convicted of a lesser offense of manslaughter.  You don't have a manslaughter instruction here, because there's no evidence of serious provocation of anybody by [Mario].  So you're not given that choice.  What you've been simply instructed is if there's a little bit of provocation, maybe that takes it down a notch .  Maybe what's going on out at the scene, what's said by [Mario] is some provocation from which you can have reasonable doubt if you're trying to choose between first and second degree murder."

Defense counsel discussed the willfulness element of both first and second degree murder, then turned to premeditation:

> "[A] decision to—to kill, which is made rashly or impulsively and without careful consideration is not deliberate and premeditated.  The killer that night did not commit premeditated murder.  The killer did not go there intending to kill.  That was a chance encounter.  There is no evidence that that is anything else but a chance encounter.... And it didn't start out as the shooter wanting to kill.  The shooter went there wanting his money.  The shooter started out polite.  'Why didn't you call me?'  'Don't you want your ID?'  'Don't you want your ID?'  'Aren't you going to pay me?'  It was an attempt to persuade to pay.  It degenerated clearly into some sort of an argument.  An argument broke out.  An argument that doesn't excuse the killing.  Doesn't cut it down to murder [sic ].  But what it does do is it turns it into a killing that was made rashly, impulsively, and without careful consideration. [¶] ... It is a very uncomfortable position to be in to talk in great length to you about the fact that [defendant] may not have been the killer, and then have to talk about, but if he is the killer, it's second degree murder and not first

20

degree murder.  But that's what I have to do, because both Counsel have to address everything.”

On rebuttal, the prosecutor did not repeat his mistake, explaining instead:

“There were a couple of attacks on the law. Let me see here where—what I've highlighted.  Counsel is arguing to you that this was not—that if it was a murder, it was second degree, because this Defendant wasn't out hunting at this point in time.  Ladies and gentlemen, he had been hunting for three weeks.  He just happened to stumble across his prey.  If I'm driving out on a safari, and I'm on my way back to camp and that big creature that I've been looking for three or four days finally pops up, it doesn't mean that I'm not hunting just because I take that opportunity to shoot.  The decision to kill had already been made.  It had been made[—’]if he doesn't pay me there's going to be trouble.[’]”

## C. Analysis

We agree that the prosecutor plainly misstated the law of second degree murder, but we conclude the error was harmless.  Although the trial court did not inform the jurors that the statement was incorrect, it twice admonished them to follow the law as stated by the court and, if they believed an attorney's explanation of the law conflicted with the instructions, they were to follow the court's instructions.  Absent some affirmative indication in the record to the contrary, and here there is none, we presume the jury followed the court's instructions. (People v. Boyette, supra, 29 Cal.4th at p. 436.)  Defense counsel brought additional emphasis by objecting to the prosecutor's misstatement, arguing to the jury that the prosecutor misstated the law, and explaining the law in his own words.

Furthermore, the evidence overwhelmingly established defendant's guilt of first degree murder.  First, the evidence established that defendant was the shooter.  Gaylan recognized defendant, and Deidra testified that defendant talked to the two men and was present during the shooting.  After the shooting, Deidra and defendant fled the scene and hid in a garage.

Next, the evidence established that defendant shot Mario with the intent to kill him.  Defendant told Deidra that if Mario did not pay him back, things would get ugly.  When he and Mario met, defendant was angry.  He acted unreasonably bold given Mario's larger size, leading Gaylan to believe defendant was armed.  Defendant then shot Mario in the front lower neck from a distance of about five feet.  When Mario and Gaylan ran, defendant ran after them and fired more shots, after which he turned and fled.

And finally, the evidence established that the killing was premeditated and deliberate, motivated by an unpaid debt and planned in advance.  Defendant's actions and statements demonstrated he was planning to use a gun if Mario did not pay his debt. Defendant told Nina, who was Mario's good friend, about the details of the drug deal, and defendant later returned to her apartment to find Mario.  Defendant lifted his shirt and threatened Nina with his gun.  He told her, “I want my money,” and “This is on you.”  He also visited Liz, another of Mario's friends, looking for Mario.  Liz did not even know defendant, but again he threateningly displayed his gun, this time setting it on Liz's table.  When defendant and Mario encountered each other by chance about three weeks after the drug deal, defendant angrily asked Mario why he had failed to call.  Deidra told Tina the shooting was about drugs and Mario's debt to defendant.

Although we conclude this compelling evidence rendered any error harmless (People v. Booker, supra, 51 Cal.4th at p. 186), we nevertheless address defendant's rationales in support of prejudice.

Defendant claims CALCRIM No. 522 is vague and therefore did not assist the jurors in comprehending provocation because it did not explain that subjective but unreasonable

21

provocation could negate premeditation and deliberation.

The court instructed with CALCRIM No. 522 as follows:

> "Provocation may reduce a murder from first degree to second degree. The weight and significance of the provocation, if any, are for you to decide.

> "If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."

In our opinion, this instruction was adequate when considered in context with all of the relevant jury instructions. (See Fitzpatrick, supra, 2 Cal.App.4th at pp. 1294–1295 [in reviewing challenge to jury instructions, court must consider instructions as a whole].) The trial court instructed the jury that the distinction between first degree and second degree murder rested on whether "the People have proved that [defendant] acted willfully, deliberately, and with premeditation." (CALCRIM No. 521.) The court also instructed that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." (Ibid.) Importantly, the jury was instructed that it could consider provocation in determining whether the crime was second degree murder. (CALCRIM No. 522.) When considered as a whole, the instructions adequately instructed the jury that provocation may reduce first degree murder to second degree murder. As Hernandez explained: "Although CALCRIM No. 522 does not expressly state provocation is relevant to the issues of premeditation and deliberation, when the instructions are read as a whole there is no reasonable likelihood the jury did not understand this concept." (Hernandez, supra, 183 Cal.App.4th at p. 1334.)

Defendant also maintains that provocation "should have been a central issue" in this case because the evidence showed he did not go to the scene intending to kill. He claims there was substantial evidence of provocation: He encountered Mario by chance and they argued about a debt; Mario was high, intoxicated, and acting erratically; and Mario was "nearly a foot taller than [defendant]." Defendant asserts that "[w]hether he shot out of fear or anger, [he] killed rashly, impulsively, and without premeditation or deliberation." Thus, he argues, there is a reasonable likelihood that had the prosecutor not misstated the law, or had the court been willing to cure the harm, the jury would have convicted defendant of second degree murder.

We disagree with this assessment of the evidence. Mario was bigger than defendant, which is why defendant's conspicuously bold behavior led Gaylan to conclude defendant was armed. When defendant shot Mario, he did so out of anger, not fear. He had been looking for Mario and was willing to use the gun he threateningly displayed to Mario's friends. The totality of the circumstances suggested the only provocation for shooting Mario was his failure to pay the $40 debt. As the quoted portion of defense counsel's argument, above, demonstrates, even defense counsel recognized that provocation was not a central issue in this case. Counsel acknowledged that the evidence demonstrated that Mario "did very little, if anything, to provoke the shooter," but counsel urged that a "little bit of provocation" might "take[ ] it down a notch" to second degree murder. Counsel reasonably recognized this was not a strong argument.

Lastly, defendant argues the prosecutor compounded the misstatement by trivializing the meaning of premeditation and deliberation with an example of an ordinary daily decision—looking both ways before crossing train tracks—which requires deliberate and considered reflection, but takes only a short time. The prosecutor's point was that the process of deliberation and premeditation can occur very quickly, which is what the law provides. Moreover, the trial court instructed the jury on the meaning of premeditation and deliberation, and on the jury's duty to follow the law as stated by the court. (CALCRIM No. 521.)

In sum, the prosecutor's misstatement of law was harmless under any standard. (Chapman, supra, 386 U.S. at p. 24; Watson, supra, 46 Cal.2d at p. 836.)

1    (LD 4, pp. 11-20).

2             2.  Federal Standard.

3          In general, the same federal standard applies to the purportedly inappropriate comments by the

4    prosecutor regarding defense counsel as to comments made regarding the elements of an offense, i.e., a

5    reviewing court must determine whether the challenged comments "so infected the trial with unfairness

6    as to make the resulting conviction a denial of due process."  Darden, 477 U.S. at 181.  "Obviously, a

7    'prosecutor should not misstate the law in closing argument.'"  United States v. Moreland, 622 F.3d

8    1147, 1162 (9th Cir.2010) (quoting United States v. Berry, 627 F.2d 193, 200 (9th Cir.1980), cert.

9    denied, 449 U.S. 1113 (1981)).  Nevertheless, "[a]rguments of counsel which misstate the law are

10   subject to ... correction by the court."  Boyde v. California, 494 U.S. 370, 384 (1990).

11         In determining whether remarks rendered a trial fundamentally unfair, a court must judge the

12   remarks in the context of the entire proceeding to determine whether the argument influenced the jury's

13   decision.  Boyde v. California, 494 U.S. at 385; Darden, 477 U.S. at 179–82.

14            3.  Analysis.

15         Here, the 5th DCA expressly concluded that the prosecutor's remarks misstated the law but

16   nevertheless held that the error was harmless.  This Court agrees.

17         As even defense counsel himself acknowledged, it did not appear that the prosecutor's

18   misstatements of the law were intentional.  Thus, the only issue on habeas review is the prejudice, if

19   any, to Petitioner as a result of those misstatements.  First, as the state court pointed out, the trial court

20   repeatedly reminded the jurors that comments of counsel were not evidence and that the jurors should

21   follow the law given to them by the trial court in the instructions.  The instructions themselves correctly

22   stated the law of the various degrees of homicide.  Also, during his closing argument, defense counsel

23   himself pointed out that the prosecutor had misstated the distinction between first and second degree

24   murder and reminded the jurors to follow the jury instruction, which accurately explained the law.

25   Moreover, as the state court stated, the evidence against Petitioner was overwhelming: it is indisputable

26   that he shot the victim, that the shooting was intentional, premeditated, and perpetrated solely to rectify

27   a $40 debt.  The record contains only insubstantial evidence that Petitioner acted in hot blood or with

28   any of the culpable mental states for a crime of a lesser degree.  Accordingly, it is difficult to envision

how the misstatements of the law by the prosecutor--misstatements that were repeatedly corrected by the court and defense counsel, orally and through written instructions--could have affected the outcome of the case.  Certainly, they could not have had a substantial and injurious effect on the outcome. Hence, the error was harmless.  <u>Brecht</u>, 507 U.S. 619.

C.  <u>Failure To Cure Prosecutor's Misconduct</u>

Petitioner next contends that the trial court failed in its duty to ensure a fair trial by not curing the prosecutorial misconduct alleged in grounds one and two.  (Doc. 27, p. 20).  This contention is without merit.

1.  <u>The 5th DCA's Opinion</u>

The 5th DCA's discussion of why it rejected grounds one and two are set forth previously and will not be repeated in full here.

2.  <u>Federal Standard and Analysis</u>

As mentioned previously, to constitute a due process violation, the prosecutorial misconduct must be so severe as to result in the denial of Petitioner's right to a fair trial. <u>Greer v. Miller</u>, 483 U.S. 756, 765, 107 S.Ct. 3102, 3108–09 (1987).   In grounds one and two, Petitioner framed this argument in terms of prosecutorial misconduct on two separate occasions; however, in this claim, Petitioner framed the issue as one of alleged trial error because the trial court permitted the misconduct to occur purportedly without "curing" it at trial.

As discussed in the previous two sections, however, the trial court was well aware of Petitioner's objections to the prosecutor's comments and took great pains to remedy the situations at the times they occurred.  Thus, it is specious for Petitioner to assert that the trial court did not attempt to "cure" the errors.  Moreover, the Court has already concluded that neither of Petitioner's prosecutorial misconduct claims rises to the level of having had a "substantial and injurious" effect on the outcome, and therefore they are harmless.  Accordingly, if such errors are harmless, the trial court's failure, if any, to "cure" the errors would, necessarily, also be harmless.  Hence, the Court concludes that there was no error committed by the trial court.  But even if there were error, the Court may grant habeas corpus relief only if the error "had substantial and injurious effect or influence in determining the jury's verdict."  <u>Brecht</u>, 507 U.S. at 623.  Petitioner has failed to establish that this is the case; therefore, the

claim should be rejected.

D. <u>Admission of Gun Evidence</u>

Petitioner also contends that the trial court erred in admitting into evidence the gun Petitioner possessed when he was arrested, even though that weapon was not the murder weapon.  This contention lacks merit.

1. <u>The 5th DCA's Opinion.</u>

The 5th DCA rejected Petitioner's claim as follows:

> Defendant contends the trial court abused its discretion by admitting into evidence the gun defendant possessed when he was arrested, which was not the murder weapon, and allowing it into the jury room during deliberations.  He argues there was no evidence connecting the gun to either the murder or the firearm possession.  The People counter that the gun was relevant to show premeditation and deliberation because it established that defendant had knowledge and familiarity with weapons and intended to kill at the time of the shooting.  We agree the gun was irrelevant, but we conclude its admission was harmless.

> **A. Law**

> Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid.Code, § 210.)  In reviewing a trial court's relevance ruling we apply the abuse of discretion standard.  (<u>People v. Panah</u> (2005) 35 Cal.4th 395, 474.)

> In <u>People v. Riser</u> (1956) 47 Cal.2d 566, the Supreme Court held that "[w]hen the prosecution relies ... on a specific type of weapon, it is error to admit evidence that other weapons were found in [the defendant's] possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons."  (<u>Id.</u> at p. 577.)  Other courts have reiterated that "[e]vidence of possession of a weapon not used in the crime charged against [the] defendant leads logically only to an inference that [he] is the kind of person who surrounds himself with deadly weapons—a fact of no relevant consequence to determination of the guilt or innocence of the defendant."  (<u>People v. Henderson</u> (1976) 58 Cal.App.3d 349, 360 [second handgun found in defendant's apartment not used in the assault was irrelevant for any purpose]; <u>see also People v. Archer</u> (2000) 82 Cal.App.4th 1380, 1392–1393 [knives found in defendant's backyard almost two years after the murder with which he was charged, which were not the murder weapons, were irrelevant to show planning or availability of weapons]; <u>People v. Witt</u> (1958) 159 Cal.App.2d 492, 497 [weapons that were not taken in the burglary of which defendant was convicted, but were found in his car, were inadmissible at his trial for burglary].)

> Conversely, evidence of the defendant's possession of a weapon is admissible when it is probative on issues other than the defendant's propensity to possess weapons.  (<u>People v. Jablonski</u> (2006) 37 Cal.4th 774, 821–822 [homemade handcuffs, duct tape, and stun gun found in defendant's vehicle upon his arrest were relevant to premeditation, a disputed fact, because they showed he planned to restrain or immobilize victims]; <u>People v. Cox</u> (2003) 30 Cal.4th 916, 956 ["when weapons are otherwise relevant to the crime's commission, but are not the actual murder weapon, they may still be admissible"; guns were relevant either as possible murder weapons or as weapons used to coerce the victims into defendant's car], disapproved on other grounds in <u>People v. Doolin, supra,</u> 45 Cal.4th at p. 421, fn. 22; <u>People v. Smith</u> (2003) 30 Cal.4th 581, 614 [gun was relevant to intent because defendant claimed shooting was an accident and evidence that he possessed an unloaded gun and no ammunition that fit it, and that

he chose instead to take a loaded gun, was relevant to defendant's credibility]; <u>People v. Gunder</u> (2007) 151 Cal.App.4th 412, 416 [defendant's possession of a firearm shortly before shootings was relevant to refute his claim that police planted the firearm found in his possession].)

**B. Analysis**

Here, although premeditation was a disputed fact in that the defense argued defendant might have been provoked, defendant's possession of a different gun the day after the shooting (which also appeared to be different than the guns described by Nina and Liz) was not relevant to his premeditation. The gun he possessed upon his arrest had no relationship to the charged crimes and thus was relevant only to show defendant was the sort of person who carried various guns. Nevertheless, even if we conclude the trial court abused its discretion in admitting evidence of the gun, we would find any error harmless. The evidence that defendant committed first degree murder was overwhelming, plus there was already evidence supporting the inference that defendant was the sort of person who carried at least two different guns in the period of a few weeks. Admission of the gun was harmless. (<u>Chapman, supra</u>, 386 U.S. at p. 24; <u>Watson, supra</u>, 46 Cal.2d at p. 836.)

(LD 4, pp. 30-32).

            2.  <u>Federal Standard And Analysis</u>.

Simple errors of state law do not warrant federal habeas relief. <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991). "The issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point." <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919-20 (9th Cir.1991). "The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." <u>Johnson v. Sublett</u>, 63 F.3d 926, 930 (9th Cir.1995) (citing <u>Estelle</u>, 502 U.S. at 67-68, 112 S.Ct. 475). Thus, to the extent that the claim rests entirely upon state evidentiary laws, no habeas relief is warranted. <u>Estelle</u>, 502 U.S. at 67.

Moreover, the claim does not justify habeas relief under the AEDPA. Under that law, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by "clearly established Federal law," as laid out by the Supreme Court. 28 U.S.C. § 2254(d). In cases where the Supreme Court has not adequately addressed a claim, this court cannot use its own precedent to find a state court ruling unreasonable. <u>Carey v. Musladin</u>, 549 U.S. 70, 77 (2006).

The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, <u>see Williams v. Taylor</u>, 529 U.S. 362,

375 (2000), it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial

evidence constitutes a due process violation sufficient to warrant issuance of the writ.  Absent such

"clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable

application."  Musladin, 549 U.S. at 77.  Under the strict standards of AEDPA, this Court is therefore

without power to issue the writ on the basis of Petitioner's claim that admission of the gun found at

Petitioner's residence violated his right to due process.  This conclusion is bolstered by the fact that, as

mentioned previously, the evidence against Petitioner was overwhelming, and, hence, the introduction

of this weapon into evidence could not have had a substantial and injurious effect upon the outcome of

the trial.  Brecht, 507 U.S. at 623.

   E.  Admission of Involuntary Witness Statement

       Petitioner next argues that the admission of Deidra's pretrial statement to Benson was

involuntary and thus inadmissible.  This contention is without merit.

       1.  The 5th DCA's Opinion.

The appellate court denied Petitioner's claim with the following explanation:

Defendant argues that Deidra's pretrial statement to Benson was involuntary because it was the
product of a custodial interrogation conducted without Miranda advisements.  Defendant claims
his failure to object below was not a forfeiture because the then-current law would have made
the objection futile.  The change in law to which he refers is the recent case of J.D.B. v. North
Carolina (2011) ___ U.S. ___ [131 S.Ct. 2394] (J.D.B.), in which the United States Supreme
Court ruled that police must consider age when deciding whether a juvenile suspect is in
custody for Miranda purposes. Defendant asserts that before J.D.B. was decided, "the question
of whether Deidra ... was in custody was still a 'one-size-fits-all' question that depended on the
objective circumstances of the interrogation, not the subjective view of either party. [Citation.]
[¶]  Had the defense objected to the voluntariness of [Deidra's] statement, the trial court would
have analyzed the custodial issue under the old rule—from the perspective of a reasonable adult.
The state of the law at trial rendered objection futile."

We agree with the People that the state of the law at the time of trial did not render defendant's
objection futile.  J.D.B. requires that a juvenile's age be considered as one of many relevant
factors in the totality of circumstances. (J.D.B., supra, ___ U.S. at p. ___ [131 S.Ct. at p. 2406].)
But nothing prohibited defendant from arguing at the time of trial that Deidra's age was a factor
in determining the voluntariness of her statement to Benson.  Even before J.D.B., no single
factor was dispositive in determining voluntariness; rather, courts considered the totality of
circumstances. (People v. Williams (1997) 16 Cal.4th 635, 660–661.)  In considering the totality
of the circumstances, relevant elements included the existence of police coercion; the length of
the interrogation; the location of the interrogation; the continuity of the interrogation; and the
subject's maturity, education, physical condition, and mental health.  (Id. at p. 660; People v.
Massie (1998) 19 Cal.4th 550, 576.)  Other characteristics to be considered were the subject's
age, sophistication, prior experience with the criminal justice system, and emotional state.  (In
re Shawn D. (1993) 20 Cal.App.4th 200, 209.)

1
2
3
4
5

Because defendant could have objected under the then-current law, and he did not do so, he forfeited the issue of voluntariness. Defendant's failure to object below further prevents us from reviewing the issues because "the parties had no incentive to fully litigate this theory below, and the trial court had no opportunity to resolve material factual disputes and make necessary factual findings. Under such circumstances, a claim of involuntariness generally will not be addressed for the first time on appeal. [Citations.]" (People v. Ray (1996) 13 Cal.4th 313, 339; People v. Gurule (2002) 28 Cal.4th 557, 602 [same; objection not preserved for appeal, citing Ray ].) Contrary to defendant's position, there were factual discrepancies between Deidra's and Benson's version of the events that were relevant to a voluntariness determination.

6
7
8
9
10

Lastly, even if the issue had not been forfeited, we would find any error in the admission of Deidra's statement harmless. (Arizona v. Fulminante (1991) 499 U.S. 279, 310 [admission of an involuntary statement at trial is subject to harmless error review, citing Chapman, supra, 386 U.S. 18]; People v. Cahill (1993) 5 Cal.4th 478, 482.) In anticipation of this argument by defendant, our review of the evidence—which we have described as overwhelming evidence of first degree murder—included only Deidra's trial testimony and not any evidence provided by her statement to Benson. Thus, we can say that any error in the admission of Deidra's statement to Benson was harmless under any standard. (Chapman, supra, 386 U.S. at p. 24; Watson, supra, 46 Cal.2d at p. 836.)

11

(LD 4, pp. 32-34).

12

2. Federal Standard And Analysis.

13

Respondent first argues that the claim is procedurally barred. The Court agrees.

14

State courts may decline to review a claim based on a procedural default. Wainwright v. Sykes,

15 433 U.S. 72, 86–87 (1977). Federal courts "will not review a question of federal law decided by a state

16 court if the decision of that court rests on a state law ground that is independent of the federal question

17 and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991); LaCrosse v.

18 Kernan, 244 F.3d 702, 704 (9th Cir. 2001); see Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991); Park v.

19 California, 202 F.3d 1146, 1150 (2000) ("A district court properly refuses to reach the merits of a

20 habeas petition if the petitioner has defaulted on the particular state's procedural requirements . . . .");

21 see also Fox Film Corp. v. Muller, 296 U.S. 207, 210 (1935). This concept has been commonly

22 referred to as the procedural default doctrine. This doctrine of procedural default is based on concerns

23 of comity and federalism. Coleman, 501 U.S. at 730-32. If the court finds an independent and

24 adequate state procedural ground, "federal habeas review is barred unless the prisoner can demonstrate

25 cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the

26 claims will result in a fundamental miscarriage of justice." Noltie v. Peterson, 9 F.3d 802, 804-805 (9th

27 Cir. 1993); Coleman, 501 U.S. at 750; Park v. California, 202 F.3d 1146, 1150 (9th Cir. 2000).

28

The mere occurrence, however, of a procedural default will not necessarily bar a federal court

from reviewing claims in a petition for writ of habeas corpus.  In order for the procedural default doctrine to apply and thereby bar federal review, the state court determination of default must be grounded in state law that is both *adequate* to support the judgment and *independent* of federal law. Ylst, 501 U.S. at 801; Coleman, 501 U.S. at 729-30; see also Fox Film Corp., 296 U.S. at 210.  Put another way, the procedural default doctrine will apply only if the application of the state procedural rule provides "an adequate and independent state law basis" on which the state court can deny relief. Park, 202 F.3d at 1151, *quoting*, Coleman, 501 U.S. at 729-30.

"For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law." LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001) (*citing* Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)); Morales v. Calderon, 85 F.3d 1387, 1393 (9th Cir. 1996) ("Federal habeas review is not barred if the state decision 'fairly appears to rest primarily on federal law, or to be interwoven with federal law.'" (*quoting* Coleman, 501 U.S. at 735).  "A state law is so interwoven if 'the state has made application of the procedural bar depend on an antecedent ruling on federal law [such as] the determination of whether federal constitutional error has been committed.'" Park, 202 F.3d at 1152 (*quoting* Ake v. Oklahoma, 470 U.S. 68, 75 (1985)).

To be deemed adequate, the state law ground for decision must be well-established and consistently applied. Poland v. Stewart, 169 F.3d 573, 577 (9th Cir. 1999) ("A state procedural rule constitutes an adequate bar to federal court review if it was 'firmly established and regularly followed' at the time it was applied by the state court.")(*quoting* Ford v. Georgia, 498 U.S. 411, 424, 111 S.Ct. 850 (1991)).  Although a state court's exercise of judicial discretion will not necessarily render a rule inadequate, the discretion must entail "'the exercise of judgment according to standards that, at least over time, can become known and understood within reasonable operating limits.'"  Id. at 377 (*quoting* Morales, 85 F.3d at 1392).

California law requires that, with certain exceptions, appellate courts will not consider claims of error that could have been raised, but were not, in the trial court. Peole v. Vera, 15 Cal.4[th] 269, 275 (1997).  That rule has been deemed both independent of federal law, People v. Williams, 16 Cal.4[th] 153, 208 (1997), and consistently applied. Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002). Here, the record clearly establishes that defense counsel failed to tender a timely objection regarding

voluntariness.  (LD 4, pp. 33-34).  Hence, the state court's determination that the claim has been procedurally defaulted bars federal review in this case.

Second, as with the previous claim, there is no clearly established federal law by the United States Supreme Court on the issue of whether the admission of coerced testimony of a third party at a criminal trial violates the defendant's Due Process rights.  Although various federal circuit courts of appeal have staked out positions on this issue, the Supreme Court has not.  Accordingly, under the AEDPA, which limits relief to violations of clearly established U.S. Supreme Court law, no relief can be given.  E.g., Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009)(even if erroneous admission of evidence renders trial fundamentally unfair, no relief permitted unless forbidden by clearly established federal law).

Finally, even if the foregoing were not true, the claim fails on its merits because the error would be harmless under Brecht.  The state courts correctly observed that the evidence against Petitioner was overwhelming.  Thus, even assuming, arguendo, that Deidra's involuntary pre-trail statement was erroneously admitted, it could not have had a "substantial and injurious" effect on the verdict.  Brecht, 407 U.S. at 637-639.  For all of these reasons, the claim should be rejected.

F. Ineffective Assistance Of Counsel.

Petitioner contends that he was denied his Sixth Amendment right to the effective assistance of trial and appellate counsel.  The Court disagrees.

1. The 5th DCA's Opinion.

The 5th DCA denied Petitioner contention as follows:

Defendant contends defense counsel was ineffective for failing to redact a gang reference in Nina's statement to Benson.  Defendant argues that the reference was not harmless because it supported the theory that he killed Mario so people on the street would not think he was a "punk," and it undermined the defense theory that he was provoked.  He claims it is reasonably probable that the jury would have convicted him of second degree murder rather than first degree murder had they not heard the reference to a gang.  We conclude the error was harmless.

Nina's recorded interview with Benson was played for the jury, including the following portion:

"[Defendant's] real hot headed because I done kicked him outta my house and, you know ... [¶] ... my brother ... [¶] ... come get his little ass outta my house 'cause, you

know, I told him I ain't deal with 'em.  I don't deal with—that gang stuff stays outta my house.  Keep that outta my house.  Comes in here bouncing around, like he could whip anybody, control thing.  Talkin' about shut things down and ..." (Italics added.)

Later, outside the presence of the jury, defense counsel stated for the record:

"... I did have a problem come up that I wanted to put on the record, which is, that in attempting to redact Nina['s] ... statement, I redacted the two gang references, but there was a third gang reference very close to the end that slipped through that I missed.... I don't think it would be helpful to me now to—to go back and attempt to redact the third gang reference, because the jury might then assume correctly that the other two redactions were gang references as well, and then they might wonder about a case in which there are three gang references.  So I think I have to leave the gang references alone."

The court responded:

"Well, in any event, we're at this point in light of the playing of the tape and the CD and the transcript, and obviously there won't be any reference in closing argument to those points.  And I think Counsel's concern is perhaps somewhat unduly heightened, but I understand Counsel's concern.  But I think at the end of the day those items aren't going to be determinative of the jury's verdict."

We recognize the potentially prejudicial effect of gang membership evidence, especially in a case devoid of gang evidence. (People v. Carter (2003) 30 Cal.4th 1166, 1194 ["evidence of a defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged"]; People v. Albarran (2007) 149 Cal.App.4th 214, 223 ["California courts have long recognized the potentially prejudicial effect of gang membership"; "'The word gang ... connotes opprobrious implications' "].)

But even assuming the passing reference to "gang stuff" was error, we conclude it was harmless in light of the overwhelming evidence of first degree murder. (Chapman, supra, 386 U.S. at p. 24; Watson, supra, 46 Cal.2d at p. 836.)

Having found no resulting prejudice, we need not address whether the performance of counsel was deficient. (Strickland v. Washington (1984) 466 U.S. 668, 697; People v. Hester (2000) 22 Cal.4th 290, 296–297 [if on review court finds that alleged incompetence of counsel was not prejudicial, court need not address whether counsel's actions were deficient].)

(LD 4, pp.  34-36).

     2.  Federal Standard.

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of counsel are reviewed according to Strickland 's two-pronged test. Miller v. Keeney, 882 F.2d 1428, 1433 (9th

1  Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S.

2  75(1988) (holding that where a defendant has been actually or constructively denied the assistance of

3  counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is

4  that Strickland does apply where counsel is present but ineffective).

5       To prevail, Petitioner must show two things. First, he must establish that counsel's deficient

6  performance fell below an objective standard of reasonableness under prevailing professional norms.

7  Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Second, Petitioner must establish that he

8  suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional

9  errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability

10 sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what

11 counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v.

12 Calderon, 151 F.3d 1170, 1173 (9th Cir.1998).

13      With the passage of the AEDPA, habeas relief may only be granted if the state-court decision

14 unreasonably applied this general Strickland standard for ineffective assistance.  Knowles v.

15 Mirzayance, 556 U.S. ___, 129 S.Ct. 1411, 1419 (2009).  Accordingly, the question "is not whether a

16 federal court believes the state court's determination under the Strickland standard "was incorrect but

17 whether that determination was unreasonable–a substantially higher threshold."  Schriro v. Landrigan,

18 550 U.S. 465, 473 (2007); Knowles, 129 S.Ct. at 1420.  In effect, the AEDPA standard is "doubly

19 deferential" because it requires that it be shown not only that the state court determination was

20 erroneous, but also that it was objectively unreasonable.  Yarborough v. Gentry, 540 U.S. 1, 5 (2003).

21 Moreover, because the Strickland standard is a general standard, a state court has even more latitude to

22 reasonably determine that a defendant has not satisfied that standard.  See Yarborough v. Alvarado, 541

23 U.S. 652, 664 (2004)("[E]valuating whether a rule application was unreasonable requires considering

24 the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in

25 case-by-case determinations").

26      Here, the state court identified the appropriate federal standard by applying Strickland.  Thus,

27 the only issue is whether the state court's adjudication, i.e., that defense counsel's representation was

28 neither deficient nor prejudicial, was not contrary to or an unreasonable application of Strickland.  For

the reasons discussed below, the Court concludes that it was not.

### 3. Analysis.

#### a. Direct Appeal

Respondent argues that defense counsel's failure to redact the third gang reference in Nina's pre-trial statement was ineffective assistance. The 5th DCA, as referenced above, concluded that no prejudice inured to Petitioner as a result of the error. The Court agrees.

First, it is undisputed that defense counsel reviewed Nina's statement prior to its admission and proactively redacted two other gang references. By his own admission, counsel inadvertently let the third reference "slip" through. In camera, counsel acknowledged that attempting to redact the third reference to gangs at that point would only serve to highlight the other two redactions and lead the jury to speculate that those involved gang references also.

"Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. Strickland, 466 U.S., at 689-690. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." Id., at 689; see also Bell v. Cone, 535 U.S. 685, 702 (2002); Lockhart v. Fretwell, 506 U.S. 364, 372 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. Strickland, 466 U.S., at 690.

Although the state court did not address the deficient performance prong of Strickland, the Court, reviewing the issue de novo,[2] concludes that counsel's inadvertent error was not sufficiently

---

[2] Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2011); Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.2003); Greene v. Lambert, 288 F.3d 1081, 1089 (9th Cir.2002) (when there is an adjudication on the merits but no reason for the decision, the court must

1  egregious to constitute ineffective assistance.  The Supreme Court indicated the "most deferential"

2  standard for evaluating counsel's performance governs here, that "Strickland does not guarantee perfect

3  representation, only a reasonably competent attorney," and there "is no expectation that competent

4  counsel will be a flawless strategist or tactician."  Harrington v. Richter, 562 U.S. 86, 110 (2011)

5  (emphasis supplied). Applying those liberal principles, the Court concludes the state court reasonably

6  could have determined, had it chosen to do so, the deficient performance prong of Strickland was not

7  met based on counsel's inadvertent failure to redact the third gang reference from Nina's pre-trial

8  statement.  Put otherwise, the Court concludes, at a minimum, fair-minded jurists could disagree on this

9  issue.

10         As to the prejudice prong, the Court agrees with the 5th DCA that, given the overwhelming

11  evidence of first-degree murder, any error was harmless under Brecht. The brief and passing reference

12  to "gang stuff" could hardly have had a substantial and injurious impact on the jury's verdict in light of

13  all of the evidence.

14                         b.  Collateral Review

15         Respondent first contends that review of this aspect of Petitioner's ineffective assistance claim

16  is procedurally barred because the California Supreme Court summarily denied the claim with a

17  citation to In re Clark, 5 Cal. 4th 750, 767-769 (1993).  The Court agrees.

18         Clark provides that a state habeas petitioner cannot present "the reasons against the validity of

19  the judgment…piecemeal by successive proceedings for the same general purpose." Clark, 5 Cal.5th at

20  769-770.  The Clark court went on to hold that California courts will not consider "newly presented

21  grounds for relief which were known to the petitioner at the time of a prior collateral attack on the

22  judgment." Id., at 767-768.  The Clark timeliness bar is both adequate and independent of federal law.

23  Walker v. Martin, 562 U.S. ___, 131 S.Ct. 1120, 1126 (2011).

24         Here, Petitioner's first state habeas petition in the California Supreme Court failed to raise this

25

26  review the complete record to determine whether resolution of the case constitutes an unreasonable application of clearly
established federal law); Delgado, 223 F.3d at 982 ("Federal habeas review is not de novo when the state court does not

27  supply reasoning for its decision, but an independent review of the record is required to determine whether the state court
clearly erred in its application of controlling federal law.").  "Independent review of the record is not de novo review of the
constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is

28  objectively unreasonable." Himes, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has
the burden of "showing there was no reasonable basis for the state court to deny relief." Harrington, 131 S.Ct. at 784.

ineffective assistance claim; it was first raised in a subsequent habeas petition.  Petitioner presented no cause and prejudice for failing to raise the claim in his first petition before the state high court, nor did he establish a fundamental miscarriage of justice.  Harris v. Reed, 489 U.S. 255, 262 (1989).  Accordingly, the California Supreme Court was entirely justified in rejecting the second petition via Clark.  Accordingly, the claim is procedurally barred in these proceedings.

However, even were that not the case, the claim fails on its merits. In challenges to the effective assistance of appellate counsel, the same standards apply as with the claims of ineffective assistance of trial counsel.  Smith v. Robbins, 528 U.S. 259, 285 (2000); Smith v. Murray, 477 U.S. 527 (1986).   In Smith, the United States Supreme Court indicated that an appellate attorney filing a merits brief need not and should not raise every non-frivolous claim.  Robbins, 528 U.S. at 288.  Rather, an attorney may select from among them in order to maximize the likelihood of success on appeal.  Id.  As a result, there is no requirement that an appellate attorney raise issues that are clearly untenable.  Gustave v. United States, 627 F.2d 901, 906 (9th Cir. 1980); see also Gillhan v. Rodriguez, 551 F.2d 1182 (10th Cir. 1977).

As discussed previously, the 5th DCA concluded that any error in admitting Deidra's statement was harmless in light of the overwhelming evidence of Petitioner's guilt.  Specifically, the Court notes that the evidence established that Petitioner fired the weapon, that, shortly before the shots were fired, witnesses saw Petitioner talking to the victim, and shortly after the shots witnesses saw Petitioner running away, that Petitioner had the intent to kill in that he was angry with the victim about the unpaid debt, and that the shooting was premeditated and deliberate in that Petitioner had told numerous witnesses that he had a gun and was looking for the victim.  After the shooting, Deidra, who admitted she was with Petitioner at the time of the shooting, told her mother that the shooting was about drugs and the victim's debt to Petitioner.

As Respondent points out, Deidra's pre-trial statement contained information about which she later testified at trial or about which other witnesses testified.  As such, it contained no new or different information than what was already before the jury.  In sum, the evidence was overwhelming and therefore, under Strickland, no prejudice had been established for defense counsel's failure to exclude Deidra's testimony or for appellate counsel's failure to raise the issue in the context of trial counsel's ineffectiveness.

### G.  Cumulative Error

Last, Petitioner argues that the preceding errors cumulatively deprived him of a fair trial.
Again, this contention is without merit.

#### 1.  The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim of cumulative error as follows:

> Lastly, defendant asserts that even if the foregoing claims of error do not amount to reversible error individually, their cumulative effect does.  Because we have found either no error or harmless error in each instance, defendant's contention that he prejudicially suffered from the cumulative effect of errors must fail.

(LD 4, p. 38).

#### 2.  Federal Standard And Analysis.

The cumulative prejudicial effect of multiple trial errors must be considered in determining whether habeas relief is warranted.  28 U.S.C. § 2254.  Phillips v. Woodford, 267 F.3d 966, 985 (9th Cir. 2001).  Here, however, as discussed above, there are no constitutional errors to accumulate.  See Villafuerte v. Stewart, 111 F.3d 616, 632 (9th Cir. 1997)(per curiam).  In analyzing prejudice in a case in which it is questionable whether any "single trial error examined in isolation is sufficiently prejudicial to warrant reversal," the Ninth Circuit has recognized the important of considering the "cumulative effect of multiple errors" and not simply conducting a "balkanized, issue-by-issue harmless error review."  United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996); see also Whelchel v. Washington, 232 F.3d 1197, 1124 (9th Cir. 2000)(noting that cumulative error applies on habeas review); Matlock v. Rose, 731 F.2d 1236, 1244 (6th Cir. 1984)("Errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair.").

"Multiple errors, even if harmless individually, may entitle a petitioner to habeas relief if their cumulative effect prejudiced the defendant."  Ceja v. Stewart, 97 F. 3d 1246, 1254 (9th Cir. 1996), citing Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir. 1992).  "Although no single alleged error may warrant habeas corpus relief, the cumulative effect of errors may deprive a petitioner of the due process right to a fair trial."  Karis v. Calderon, 283 F.3d 1117, 1132 (9th Cir. 2002).  However, the Ninth

Circuit has also recognized that where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation.  See Rup v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996).

Here, as with the 5th DCA's result, this Court has found either no error or harmless error. Although the cases advise that, in special circumstances, cumulative harmless error may entitle a petitioner to relief, the Court does not find that to be the case in this instance.  The cases of harmless error are few and limited.  In sum, they are, in the Court's view, insufficient by themselves to have cumulatively had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623.  Thus, Petitioner is not entitled to habeas relief.

## RECOMMENDATION

Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1), be **DENIED** with prejudice.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  **Within 21 days** after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed **within 10 days** (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:   **December 9, 2015**                          **/s/ Jennifer L. Thurston**
                                                        UNITED STATES MAGISTRATE JUDGE